Joel S. KELLY, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–00–00206–CR.

Court of Appeals of Texas,
Dallas.

Oct. 12, 2001.

R.J. Hagood, Denison, for appellant.

Robert T. Jarvis, County Attorney, Karla Renae Baugh, Asst. County Attorney, Sherman, for the State.

Before Justices KINKEADE, WRIGHT, and FITZGERALD.

## OPINION

Opinion By Justice FITZGERALD.

A jury found Joel S. Kelly guilty of aggravated assault with a deadly weapon and assessed his punishment at seventeen years' confinement. In two points of error, appellant contends the trial court erred in allowing the State to impeach its own witness with a prior inconsistent statement and in failing to hold an evidentiary hearing to determine whether a juror could continue to be fair and impartial after the juror witnessed appellant make a threatening gesture in court. We affirm the trial court's judgment.

## Background

Andre Johnson noticed a brown Monte Carlo drive by while he was walking down the street on February 18, 1999. Appellant and one or two of his friends were in the car, which stopped on the corner where Johnson was standing. The window on the driver's side rolled down, and words were exchanged between Johnson and the driver. Appellant got out of the passenger side of the car to talk to Johnson; then appellant got back in the car and drove away. Johnson was concerned after the confrontation and decided to leave the area. However, as Johnson walked down the street, the Monte Carlo drove by again. Appellant was sitting on the passenger side. This time several witnesses, including Johnson, saw appellant pull out a gun and fire at Johnson.

## Impeachment by the State of its Own Witness

In his first point of error, appellant contends the trial court erred in permitting the State to impeach its own witness with evidence of a prior inconsistent statement. The State called Jackie Johnson, a friend of appellant, as a witness. In response to the prosecutor's questions, Jackie Johnson testified he did not see appellant with a gun on the day of the shooting, and he denied telling Detective Atherton he had. Jackie Johnson further denied telling Atherton that appellant hid a gun behind Jackie's mother's house on the day of the shooting. The State then called Atherton as a witness. Atherton testified he interviewed Jackie Johnson about the case, and Jackie told him he had seen appellant in possession of the firearm. Defense counsel objected on the basis the testimony was improper impeachment and was intended to elicit inadmissable hearsay, but the objection was overruled.[1]

1. The State argues appellant did not preserve error on this point because his objection to Atherton's testimony made no reference to rule 403. "When the ground for objection or complaint to the granting of a State's challenge for cause is obvious to the trial judge and opposing counsel, and there is no suggestion in the record that the parties did not know the basis and nature of the defendant's objection or complaint, a general objection or 'exception' is usually sufficient to preserve the error." *Miller v. State,* 741 S.W.2d 382, 387 (Tex.Crim.App.1987). Appellant's objection was more than a "general objection" or "exception." It is apparent from the record that the trial court and opposing counsel understood the basis of appellant's objection, *i.e.,* the State called Jackie Johnson solely to impeach him and to get inadmissible hearsay before the jury under that guise. *See id.; cf. Miranda v. State,* 813 S.W.2d 724, (Tex.App.—San Antonio 1991, pet. ref'd) (concluding objections to hearsay and improper predicate were insufficient to make improper impeach-

Appellant argues the State improperly called a witness for the sole purpose of impeaching him with otherwise inadmissible hearsay evidence. The general rule, of course, is "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." TEX.R. EVID. 607. However, appellant correctly asserts that courts have refused to allow impeachment by prior inconsistent statements to be used "as a mere subterfuge to get before the jury evidence not otherwise admissible." *See Hughes v. State*, 4 S.W.3d 1, 4 (Tex.Crim.App.1999). The *Hughes* court addressed precisely that situation. That court reviewed a stepfather's conviction for indecency with a child. The defendant's wife—the child's mother—allegedly told Child Protective Services ("CPS") workers that her daughter had reported the abuse to her and that her husband had confessed the abuse to her. However, at a pretrial hearing, the mother denied making those statements. *Id.* at 2–3. The State called the mother again at trial, and again the mother admitted meeting with the CPS workers but denied making the statements concerning her daughter and husband. The State then called the CPS workers to impeach that testimony; they repeated each of the statements allegedly told to them by the mother. The trial court admitted the testimony on impeachment grounds, over defense counsel's objection. *Id.* at 3.

On appeal, the court of criminal appeals acknowledged it had not dealt squarely with this issue before. The court identified the key issue in the analysis to be the State's knowledge—before calling the witness—that the witness would testify unfavorably. However, the court refused to "graft" onto rule 607 a requirement of surprise (and injury) before impeachment

of one's own witness could occur. Instead, the court concluded:

> the State's knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403. Analyzing lack of surprise or injury in terms of Rule 403 is preferable not only because it comports with the plain language of Rule 607, but because it will lead to the conclusion that a trial court abuses its discretion under Rule 403 when it allows the State to admit impeachment evidence for the primary purpose of placing evidence before the jury that was otherwise inadmissible.

*Id.* at 5. In summary, the court of criminal appeals acknowledged the problem of the State's calling a witness, knowing full well she would not repeat her earlier incriminating statements, and then following her with a State's witness who would provide the desired evidence via hearsay. The answer for the court, though, was *not* to limit the express language of rule 607, but to look at the State's knowledge as part of the balancing analysis required by rule 403. *See id.*

In *Hughes*, the court of criminal appeals conducted the rule 403 balancing test and determined, although there were legitimate reasons to call the mother to testify at trial, the State had offered no explanation for why it thought she would testify to the statements she had disavowed at the pretrial conference. *Id.* at 6–7. Moreover, the court stressed that the State had not been able to elicit *any* favorable testimony from the mother. As a result, the court concluded the State had "little, if any, legitimate purpose in admitting [the mother's] prior inconsistent statements to impeach her testimony." *Id.* at 7. In the

ment complaint obvious to trial court). We conclude appellant sufficiently informed the

trial court of his objection and thus preserved error for our review.

end, the "highly prejudicial nature" of the CPS's statements substantially outweighed any probative value they might have had. The court reversed and remanded the case to the court of appeals for a harm analysis. *Id.*

Some of the facts of the instant case bear similarity to those in *Hughes*. Here, appellant's friend was called to the stand, and no testimony favorable to the State was elicited at all. In effect, Jackie Johnson's testimony merely confirmed that he denied—or could not remember—saying anything helpful to the investigating detective. His "testimony" was followed immediately by the investigating detective's, who related to the jury all the helpful information Jackie Johnson had purportedly told him after the incident. Moreover, the State concedes in its brief before this Court that "the State suspected that the witness would perjure himself."

On balance, though, this case does not require the same outcome as *Hughes*. In that case, the mother's hearsay statements included the child's outcry charge of abuse and the perpetrator's confession. The opinion does not reveal any other possible independent source of that critical evidence. As a result, admitting it for impeachment purposes posed a significant risk the information would be misused by the jury. In this case, several witnesses, including the target of the assault, identified appellant as the shooter; there were sources of the critical evidence other than the hearsay testimony. Even more significantly, the State knew in *Hughes* that its witness had recanted once and likely would again, but it called her nonetheless. In this case, although the State "suspected" its witness could turn, it had no reason to know this for certain. *Hughes* teaches that prior knowledge is key. We cannot say the State in this case *knew* Jackie Johnson would recant. Given that the

State considered Jackie Johnson's information "essential to establish a vital link between the murder [sic] weapon and the Appellant," we conclude the prejudicial nature of the testimony did not substantially outweigh its probative value. *See* Tex.R. Evid. 403.

■ The determination of admissibility of evidence is within the sound discretion of the trial court, *Jackson v. State*, 575 S.W.2d 567, 570 (Tex.Crim.App.1979), and will not be reversed on appeal unless a clear abuse of discretion is shown. *Werner v. State*, 711 S.W.2d 639, 643 (Tex. Crim.App.1986). We conclude appellant has not shown the trial court abused its discretion. We overrule the first point of error.

### Juror Intimidation and Bias

■ In his second point of error, appellant claims the trial court erred when it refused to allow an evidentiary hearing to investigate an alleged act of juror intimidation by appellant and its effect, if any, on the jury. During trial, one juror communicated to the bailiff, outside the presence of the other jurors, that appellant had made a gesture of slashing his hand across his throat. The bailiff informed the trial court of his conversation with the juror, and the judge admonished appellant outside the presence of the jury, saying:

> Mr. Kelly, one of the—and I'm not going to mention who—has indicated that he or she saw you make what they interpreted to be a threatening gesture to one of the jurors in this case. And you may or may not know what I'm talking about.... What I'm telling you is this: If anything like this occurs during the course of the trial, you're going to be removed from the courtroom and you're going to be tried in absentia.

Appellant's attorney sought an evidentiary hearing to determine whether the juror

could remain fair and impartial. Specifically, appellant's attorney stated, "for purposes of a mistrial motion, we need to know what [the juror] has said." The trial court ruled it was unnecessary to question the juror, but he did question the bailiff on the record. The bailiff stated:

> The juror said that she wanted or he wanted to talk to me in private. We went out in the side hallway and the juror did say that Mr. Kelly did make a gesture of going across his throat, similar to this (indicating), going across the throat. First, he thought it was just a gesture showing that the jury was going to cut his throat. But the juror said that they thought it was more of a gesture more towards them and in a threatening manner.

In response to follow-up questions from appellant's attorney, the bailiff stated the juror was more "nervous" than scared or threatened, but the bailiff was given no indication of whether the juror could "sit and be a fair juror in this case anymore." The trial court told appellant's attorney he could do some research, and the court would "take up the motion in the morning." Before the jury was charged, appellant's attorney renewed his request to question the juror, but the trial court again refused the request, citing concern for the safety of the juror.[2] The record contains no written motion for mistrial.

Under Texas constitutional provision article I, section 10, a defendant has the right to a fair and impartial jury. *See*

*Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 366 (Tex.2000) (fair trial before impartial tribunal is basic requirement of due process); *see also In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Appellant claims he may not have received a fair trial if the juror were biased.

At the outset, a person is disqualified to serve as a juror if he has a bias or prejudice in favor of or against a party in the case. TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998). Bias, such as to disqualify a juror, means the juror's state of mind leads to the inference he will not act with impartiality. Prejudice means prejudgment and therefore includes bias. *Compton v. Henrie,* 364 S.W.2d 179, 182 (Tex.1963). Traditionally, the voir dire process serves the function of identifying jurors who are biased or prejudiced concerning either the parties or the subject matter of the trial. *See id.* In the instant case, the trial court stressed repeatedly to the panel of potential jurors that the fundamental purpose of the voir dire was to assure the case would be decided by fair and impartial jurors. Counsel for appellant was afforded—and utilized—every opportunity to question the venirepersons to identify anyone who might be biased against his client or who might have prejudged his client. No objection was made by counsel that he was forced to accept a biased or prejudiced venireperson on the jury.

Indeed, appellant's allegations here do not concern any traditional notion of bias

---

**2.** One juror in the case had been dismissed from the panel before the jury was sworn. She reported to the judge that appellant's mother had contacted her husband at work about the case; the juror admitted she listened to her husband's report of what appellant's mother had told him. The judge dismissed the juror for violating his instruction not to listen to anyone talk about the case. The parties agreed to proceed with eleven

jurors. *See Hatch v. State,* 958 S.W.2d 813, 816 (Tex.Crim.App.1997) (holding a defendant may waive the twelve-juror requirement in a noncapital felony case).

There are allegations in the record concerning various witnesses being intimidated by appellant. The trial court also expressed his own "real concern" about appellant possessing the juror information released during voir dire.

or prejudice. Appellant does not argue one of the jurors began the trial with a state of mind that kept him from acting impartially or that some juror prejudged him. On the contrary, appellant argues some juror might have judged appellant based on appellant's own demeanor in the courtroom. That type of judgment does not comport with our understanding of bias or prejudice capable of disqualifying a juror from service. On the contrary, trial lawyers and judges have long known a party's courtroom demeanor can influence jurors' perceptions of that party.

Texas courts have refused to allow a defendant to profit by his own misconduct in the courtroom. In *Chamberlain v. State*, 453 S.W.2d 490, 492–93 (Tex.Crim. App.1970), the defendant became involved in a "scuffle," kicking sheriff's deputies in the presence of the jury. The defendant then asked for a mistrial, but the trial court denied the motion. The court of criminal appeals dismissed the complaint out of hand, stating the defendant's position, "if upheld, would permit a defendant to take advantage of his own misconduct, and the attempted administration of justice would be reduced to a mockery." *Id.* at 493; *accord Babbs v. State*, 739 S.W.2d 646, 648 (Tex.App.—Houston [14th Dist.] 1987, no pet.) (court refuses to "overlook" defendant's initiating threatening conduct and affirms denial of mistrial). That risk was of special concern to the trial court in the instant case with the jury already depleted. Situations such as this lend themselves to manipulation by a defendant and cannot be tolerated.[3]

This is not to say appellant was without a remedy. If he wanted to show juror bias, he could have utilized a motion for new trial, accompanied by a juror affidavit indicating such bias. *Norman v. State*, 588 S.W.2d 340, 347 (Tex.Crim.App.1979). Appellant filed a cursory motion for new trial, but he filed no juror affidavit. Nor did appellant file his own affidavit offering any explanation of what, if anything, happened in the courtroom. In fact, appellant never made an affirmative statement denying the gesture. The record, thus, gives us no reason to question the trial court's decision.

The trial judge was in the best position to ascertain the need for, and the risks of, an evidentiary hearing in the middle of trial. He questioned the bailiff who had spoken to the juror. He concluded there was not sufficient cause for interrupting the trial and requiring a sitting juror to testify. We find no abuse of discretion in that conclusion. We overrule the second point of error.

We affirm the trial court's judgment.

---

3. Appellant relies on two federal cases that discuss the need for evidentiary hearings in some instances involving jury tampering or juror misconduct through contact with external influences. *See United States v. Martinez–Moncivais*, 14 F.3d 1030 (5th Cir.1994); *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980). These opinions are not instructive in appellant's case, in which there is no claim of such misconduct by any juror.